

0UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **19-20448**-cr-MORENO

MAGISTRATE JUDGE
LOUIS

21 U.S.C. § 846
21 U.S.C. § 841
18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 2
18 U.S.C. § 982
21 U.S.C. § 853

FILED BY ___ D.C.

JUL 25 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES OF AMERICA**

**vs.**

**ROBERT COOPER,**

                 **Defendant.**

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

### Controlled Substances

1.      The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2.      The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances

to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3.     A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse, with use potentially leading to severe psychological or physical dependence, but the drug had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

4.     Pursuant to the CSA and its implementing regulations, Fentanyl was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Fentanyl, sometimes prescribed under the brand name Duragesic (in patch form) or Actiq (Oral Transmucosal Fentanyl Citrate), was used to treat severe pain. Fentanyl was highly addictive.

5.     Pursuant to the CSA and its implementing regulations, Oxycodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Oxycodone, sometimes prescribed under the brand name OxyContin, Roxicodone, Roxicet, Endocet or in combination with acetaminophen under the brand name Percocet, was used to treat severe pain. Oxycodone was highly addictive.

6.     Pursuant to the CSA and its implementing regulations, Methadone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Methadone, sometimes prescribed under the brand name Dolophine, was used to treat severe pain and opioid dependence. Methadone was highly addictive.

7.     Pursuant to the CSA and its implementing regulations, Morphine was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Morphine, sometimes prescribed under the brand name MS Contin, Roxanol, Oramorph, RMS and MSIR, was used to treat severe pain. Morphine was highly addictive.

8.     Pursuant to the CSA and its implementing regulations, Hydrocodone was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Hydrocodone, sometimes prescribed under the brand name Vicodin, Vicoprofin, Lortab, Lorcet and Norco, was used to treat severe pain. Hydrocodone was highly addictive.

9.     Pursuant to the CSA and its implementing regulations, Levorphanol was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Levorphanol was used to treat severe pain. Levorphanol was highly addictive.

10.     Pursuant to the CSA and its implementing regulations, Dextroamphetine-amphetamine was classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12. Dextroamphetine-amphetamine, sometimes prescribed under the brand name Adderrall, was used to treat attention-deficit disorder. Dextroamphetine-amphetamine was highly addictive.

11.     Pursuant to the CSA and its implementing regulations, Phentermine was classified as a Schedule III controlled substance. 21 C.F.R. § 1308.13. Phentermine, sometimes prescribed under the brand names Tenuate, Meridia, Adipex and Diethylpropion, was a weight-loss drug. Phentermine was highly addictive.

12.     Pursuant to the CSA and its implementing regulations, Lorazepam was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14. Lorazepam, sometimes prescribed under the brand name Ativan, was used to treat anxiety. Lorazepam was highly addictive.

13.     Pursuant to the CSA and its implementing regulations, Diazepam was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14. Diazepam, sometimes prescribed under the brand name Valium, was used to treat anxiety disorder, panic disorder, and anxiety caused by depression. Diazepam was highly addictive.

14.     Pursuant to the CSA and its implementing regulations, Clonazepam was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14. Clonazepam, sometimes prescribed under the brand name Klonopin, was used to treat anxiety disorder, panic disorder, and anxiety caused by depression. Clonazepam was highly addictive.

15.     Pursuant to the CSA and its implementing regulations, Carisoprodol was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14. Carisoprodol, sometimes prescribed under the brand name Soma, was used to treat muscle pain. Carisoprodol was highly addictive.

16.     Pursuant to the CSA and its implementing regulations, Phenobarbital was classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14. Phenobarbital, sometimes prescribed under the brand name Phenobarb, was used to treat anxiety. Phenobarbital was highly addictive.

17.     A combination of an opioid with a benzodiazepine and/or a muscle relaxant magnified the effects and dangers of the drugs.

18.     Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered, or exempt from registration, with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Upon application by the practitioner, the Drug Enforcement Administration (DEA) assigned a unique registration number to each qualifying medical practitioner, including physicians and nurse practitioners.

19.     Chapter 21 of the Code of Federal Regulations, Section 1306.04, governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

4

20.     Chapter 21 of the Code of Federal Regulations, Section 1306.04, further provided
that "[a]n order purporting to be a prescription issued not in the usual course of professional
treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person
knowingly filing such a purported prescription, as well as the person issuing it, shall be subject to
the penalties provided for violations of the provisions of law relating to controlled substances."

21.     All prescriptions for controlled substances had to be "dated as of, and signed on, the
day when issued and shall bear the full name and address of the patient, the drug name, strength,
dosage form, quantity prescribed, directions for use, and the name, address and registration number
of the practitioner." 21 C.F.R. § 1306.05(a).

22.     Chapter 21 of the Code of Federal Regulations, Section 1306.12, provided that

[a]n individual practitioner may issue multiple prescriptions authorizing the
patient to receive a total of up to a 90-day supply of a Schedule II controlled
substance provided the following conditions are met:

a.     Each separate prescription is issued for a legitimate medical
purpose by an individual practitioner acting in the usual course of
professional practice;

b.     The individual practitioner provides written instructions on
each prescription (other than the first prescription, if the prescribing
practitioner intends for that prescription to be filled immediately) indicating
the earliest date on which a pharmacy may fill each prescription;

c.     The individual practitioner concludes that providing the
patient with multiple prescriptions in this manner does not create an undue
risk of diversion or abuse;

d.     The issuance of multiple prescriptions as described in this
section is permissible under the applicable state laws; and

e.     The individual practitioner complies fully with all other
applicable requirements as well as any additional requirements under state
law.

23.     Effective on or about October 1, 2010, pursuant to Florida Statute Title XXXII
Chapter 458, a physician who provides professional services in a pain-management clinic must
"perform a physical examination of a patient on the same day that the physician prescribes a

5

controlled substance to a patient at a pain-management clinic." Additionally, effective on or about October 1, 2010, "[i]f the physician prescribes more than a 72-hour dose of controlled substances for the treatment of chronic nonmalignant pain, the physician must document in the patient's record the reason for prescribing that quantity." Fla. Stat. Ann. § 458.3265.

24.     Florida Statute Title XLVI Chapter 893 provided that a prescription for a controlled substance "must be dated and signed by the prescribing practitioner on the day when issued." Fla. Stat. Ann. § 893.04(1)(b).

25.     Pursuant to Florida Statute Title XXXII Chapter 458, "it shall be legally presumed that prescribing, dispensing, administering, supplying, selling, giving, mixing, or otherwise preparing legend drugs, including all controlled substances, inappropriately or in excessive or inappropriate quantities is not in the best interest of the patient and is not in the course of the physician's professional practice, without regard to his or her intent."     Fla. Stat. Ann. § 458.331(1)(q).

## The Medicare Program

26.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

27.     Medicare programs covering different types of benefits were separated into different program "parts." Part D of Medicare subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare

Prescription Drug, Improvement, and Modernization Act of 2003, and went into effect on January 1, 2006.

28.    In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies approved by Medicare. Those companies were often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

29.    A pharmacy could participate in Part D by entering a retail network agreement with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy could join the plan's network. When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan. The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

30.    A pharmacy could also submit claims to a Medicare drug plan to whose network the pharmacy did not belong. Submission of such out-of-network claims was not common and often resulted in smaller payments to the pharmacy by the drug plan sponsor.

31.    Medicare, through CMS, compensated the Medicare drug plan sponsors. Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments were called capitation fees. The capitation fee was adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

32.     Medicare and Medicare drug plan sponsors were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b).

33.     UnitedHealth ("UnitedHealth") was a Medicare drug plan sponsor.

### Privately Insured Drug Plans

34.     Commercial insurance companies, employers and private entities offered drug plans which were administered and operated by PBMs. A beneficiary in a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

35.     A pharmacy could participate in a privately insured drug plan by entering an agreement with one or more PBMs acting on behalf of a privately insured plan. When a privately insured beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim to a PBM that represented the beneficiary's privately insured drug plan. The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan reimbursed the PBM for its payments to the pharmacy.

36.     Blue Cross Blue Shield ("BCBS") and Aetna Inc. ("Aetna") were, among others, "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b).

### THE DEFENDANT AND RELEVANT ENTITIES

37.     American Pain Management Center, Inc. ("American Pain Management Center") was a corporation organized under the laws of the State of Florida and a registered pain management clinic doing business at 7710 NW 71st Court, Suite 202, Tamarac, Florida 33321.

38.     American Pain Management of Palm Beach, Inc. (American Pain Management Center and American Pain Management Palm Beach, collectively referred together as "American Pain Management") was a corporation organized under the laws of the State of Florida and a

registered pain management clinic doing business at 2100 45th Street, Suite B4, West Palm Beach, Florida 33407.

39.     Pacific Pharmacy Inc. ("Pacific Pharmacy") was a corporation organized under the laws of the State of Florida, doing business at 8876 SW 24th Street, #11, Miami, Florida 33165, purportedly providing prescription drugs to individuals.

40.     Defendant **ROBERT COOPER,** a former resident of Broward County, Florida, was a medical doctor, and the only doctor practicing at American Pain Management.

## COUNT 1
### Conspiracy to Dispense Controlled Substances
### (21 U.S.C. § 846)

1.     Paragraphs 1 through 25 and 37 through 40 of the General Allegations section of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2012, through in or around March 2018, in Miami-Dade, Broward and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

### ROBERT COOPER,

knowingly and willfully combined, conspired, and agreed with others known and unknown to the Grand Jury, to dispense controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that this violation involved Schedule II, III and IV controlled substances, that is, mixtures and substances containing detectable amounts of Fentanyl, Oxycodone, Methadone, Morphine, Hydrocodone,

Levorphanol, Dextroamphetine-ampthetamine, Phentermine, Lorazepam, Diazepam, Clonazepam, Carisoprodol and Phenobarbital.

### COUNTS 2-8
### Dispensing a Controlled Substance
### (21 U.S.C. § 841)

1.      Paragraphs 1 through 25 and 37 through 40 of the General Allegations section of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates specified below as to each count, in Miami-Dade, Broward and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

### ROBERT COOPER,

knowingly and intentionally dispensed a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); and Title 18, United States Code, Section 2:

| Count | Approx. Date | Initials of Person Who Was Prescribed Controlled Substance | Controlled Substance |
|-------|-------------|-----------------------------------------------|----------------------|
| 2 | 12/22/2014 | D.B. | 75 Hydrocodone-Acetaminophen pills |
| 3 | 11/17/2015 | H.S. | 49 Oxycontin pills |
| 4 | 7/12/2016 | H.S. | 784 Oxycontin pills |
| 5 | 7/15/2016 | E.V.E. | 600 Oxycodone-Acetaminophen pills |
| 6 | 3/9/2017 | D.B. | 270 Diazepam pills |
| 7 | 6/20/2017 | E.V.E. | 360 Lorazepam pills |
| 8 | 9/1/2017 | S.A. | 180 Carisoprodol pills |

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that the violations involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of Hydrocodone.

Pursuant to Title 21, United States Code, Section 841(b)(1)(C), it is further alleged that the violations involved a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of Oxycodone.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that the violations involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of Diazepam.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that the violations involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of Lorazepam.

Pursuant to Title 21, United States Code, Section 841(b)(2), it is further alleged that the violations involved a Schedule IV controlled substance, that is, a mixture and substance containing a detectable amount of Carisoprodol.

**COUNT 9**
**Conspiracy to Commit Wire Fraud and Health Care Fraud**
**(18 U.S.C. § 1349)**

1.      Paragraphs 26 through 40 of the General Allegations section of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around at least October 2013, through in or around March 2018, in Miami-Dade, Broward and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERT COOPER,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

      a.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicare drug plan sponsors, and private insurance plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

      b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## **Purpose of the Conspiracy**

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, Medicare drug plan sponsors, and private insurance plans through Pacific Pharmacy for prescription medications that were not medically necessary and not

eligible for reimbursement; (b) concealing and causing the concealment of false and fraudulent claims; and (c) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## **Manner and Means of the Conspiracy**

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.      **ROBERT COOPER** and his co-conspirators issued, and caused to be issued, prescriptions to Medicare and privately insured beneficiaries for medically unnecessary controlled substances and non-controlled substances.

5.      **ROBERT COOPER** and his co-conspirators submitted and caused Pacific Pharmacy to submit, via interstate wire communication, claims to Medicare and private insurance prescription drug plan sponsors that falsely and fraudulently represented that prescription drugs were medically necessary.

6.      As a result of such false and fraudulent claims, Medicare and private insurance prescription drug plan sponsors, through their PBMs, made overpayments funded by Medicare and private insurance companies to Pacific Pharmacy.

7.      **ROBERT COOPER** and co-conspirators used the proceeds for their personal use, the use of others, and to further the fraud scheme.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 10-14**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

1.      Paragraphs 26 through 40 of the General Allegations section of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around at least October 2013, and continuing through in or around March 2018, in Miami-Dade, Broward and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERT COOPER,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, Medicare drug plan sponsors and privately insured drug plans, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs.

**Purpose of the Scheme and Artifice**

3.      It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, Medicare drug plan sponsors, and private insurance plans through Pacific Pharmacy for prescription medications that were not medically necessary and not eligible for reimbursement; (b) concealing and causing the concealment of false and fraudulent claims; and (c) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**The Scheme and Artifice**

4.     Paragraphs 4 through 7 of the Manner and Means section of Count 10 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

**Acts in Execution or Attempted Execution of the Scheme and Artifice**

5.     On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, **ROBERT COOPER,** in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, Medicare drug plan sponsors and privately insured drug plans, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs:

| Count | Beneficiary | Approx. Date of Service | Claim No. | Item Claimed; Approx. Amt. Claimed | Insurance Plan or Drug Plan Sponsor |
|---|---|---|---|---|---|
| 10 | A.T. | 8/7/2014 | 14219737 6981164 | Oxycontin 30 MG; $351 | BCBS |
| 11 | S.K. | 8/13/2014 | 44693538309 | Morphine Sulfate 100 MG; $226 | UnitedHealth |
| 12 | H.B. | 8/25/2014 | 46150324183 | Fentanyl TD Patch; $157 | UnitedHealth |
| 13 | P.W. | 8/31/2014 | 20529611 2017772840 | Morphine Sulfate 60 MG; $625 | Aetna |
| 14 | H.S. | 3/21/2016 | 16079028 9410354 | Pilocarpine Tab 5 MG; $34 | BCBS |

In violation of Title 18, United States Code, Sections 1347 and 2.

## **FORFEITURE**
### **(18 U.S.C. § 982 and 21 U.S.C. § 853)**

1.     The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **ROBERT COOPER,** has an interest.

2.     Upon conviction of a violation of Title 21, United States Code, Sections 841 and/or 846, as alleged in this Indictment, the defendant shall forfeit to the United States, all property constituting or derived from, any proceeds obtained, directly or indirectly, as the result of such violation, and all property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of such violation, pursuant to Title 21, United States Code, Section 853(a).

3.     Upon conviction of a violation of Title 18, United States Code, Section 1347 and/or 1349, as alleged in this Indictment, the defendant shall forfeit to the United States all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

4.     If any of the property described above, as a result of any act or omission of the defendant:

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third party;

   c.     has been placed beyond the jurisdiction of the court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of substitute property pursuant to Title 21,

United States Code, Section 853(p).

All pursuant to Title 21, United States Code, Section 853, and Title 18, United States Code,

Sections 982.

A TRUE BILL

FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

TIMOTHY P. LOPER
SARA M. CLINGAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO._____

v.

**CERTIFICATE OF TRIAL ATTORNEY\***

**ROBERT COOPER,**

**Superseding Case Information:**

_____Defendant._____/

| Court Division: (Select One) | | | | | New defendant(s) | Yes _____ | No _____ |
|---|---|---|---|---|---|---|---|
| ✓ | Miami | ___ | Key West | | Number of new defendants | | |
| ___ | FTL | ___ | WPB | ___ FTP | Total number of counts | | |

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:   (Yes or No)   No
    List language and/or dialect   _____

4.  This case will take __5__ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                          (Check only one)

    I     0 to 5 days          ✓         Petty        _____
    II    6 to 10 days         _____   Minor        _____
    III   11 to 20 days        _____   Misdem.      _____
    IV    21 to 60 days        _____   Felony       ✓
    V     61 days and over     _____

6.  Has this case previously been filed in this District Court?      (Yes or No)   No____
    If yes: Judge                              Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?   (Yes or No)   No____
    If yes: Magistrate Case No.                _____
    Related miscellaneous numbers:             18-CR-20563-KMM; 18-CR-20560-JEM
    Defendant(s) in federal custody as of      _____
    Defendant(s) in state custody as of        _____
    Rule 20 from the District of               _____

    Is this a potential death penalty case? (Yes or No)      No____

7.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?        Yes _____      No ✓

8.  Does this case originate from a matter pending in the Northern Region U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?        Yes _____      No ✓

SARA CLINGAN
DOJ TRIAL ATTORNEY
COURT ID NO. A5502508

\*Penalty Sheet(s) attached

REV 8/13/2018

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**          **ROBERT COOPER**

**Case No:** _____

Count #:   1

  Title 21, United States Code, Section 846

  Conspiracy to Dispense Controlled Substances

**\*Max Penalty**:    Twenty (20) years' imprisonment

Counts #:   2 – 8

  Title 21, United States Code, Section 841

  Dispensing a Controlled Substance

**\*Max Penalty**:    Twenty (20) years' imprisonment as to each count

Count #:   9

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Wire Fraud and Health Care Fraud

\*Max Penalty:    Twenty (20) years' imprisonment

Counts #:   10-14

  Title 18, United States Code, Section 1347

  Health Care Fraud

\*Max Penalty:    Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**